1  RICHARD H. RAHM, State Bar No. 130728
   LITTLER MENDELSON
2  A Professional Corporation
   650 California Street
3  20th Floor
   San Francisco, CA  94108.2693
4  Telephone:    415.433.1940
   Facsimile:    415.399.8490
5
   JAMES J. OH, IL State Bar No. 6196413
6  (*pro hac vice* application forthcoming)
   LITTLER MENDELSON
7  A Professional Corporation
   200 N. LaSalle Street
8  Suite 2900
   Chicago, Illinois  60601
9  Tel: 312.372.5520
   Fax: 312.372.7880
10
   ANDREW J. VOSS, MN State Bar No. 0241556
11 (*pro hac vice* application forthcoming)
   LITTLER MENDELSON
12 A Professional Corporation
   80 South 8th Street
13 1300 IDS Center
   Minneapolis, Minnesota  55402.2136
14 Tel:  612.630.1000
   Fax:  612.630.9626
15
   Attorneys for Defendant
16 NATIONWIDE MUTUAL INSURANCE
   COMPANY
17

18              UNITED STATES DISTRICT COURT
19            NORTHERN DISTRICT OF CALIFORNIA
20
   FRANK FOSTER, PHILLIP WAMOCK,        Case No.  C3:07-CV-4928
21 individually and on behalf of all others
   similarly situated, and on behalf of the    **DECLARATION OF RICHARD H. RAHM**
22 general public,                              **IN SUPPORT OF NATIONWIDE'S**
                                                **MOTION TO TRANSFER VENUE**
23                  Plaintiff,
                                                Date:    November 30, 2007
24       v.                                     Time:    9:00 a.m.
                                                Court:   10
25 NATIONWIDE MUTUAL INSURANCE
   COMPANY,                                     Before the Honorable Susan Illston
26
                   Defendant.
27

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

DECLARATION OF RICHARD H. RAHM          U.S.D.C. CASE NO. C3:07-CV-4928 SI

I, Richard H. Rahm, declare the following:

1.    I am a shareholder of the law firm of Littler Mendelson, P.C., counsel of record in the above-entitled action. I am a member in good standing of the California State Bar, and am licensed to practice before this Court. I make the following declaration in support the motion to transfer venue of Defendant Nationwide Mutual Insurance Company ("Nationwide"). I make this declaration based on my own personal knowledge, unless otherwise stated and, if called to testify, I could and would testify competently to the matters stated herein.

2.    Attached hereto for the Court's convenience as Exhibit A is the Declaration of Teresa Wiencek, Nationwide's Vice President of Human Resources.

3.    Attached hereto as Exhibit B is a true and correct copy of a Mapquest.com inquiry I made for directions from Columbus, Ohio to San Francisco, California, which I printed. Mapquest.com calculated the distance to be 2,453 miles.

4.    Attached hereto as Exhibit C is a true and correct copy of a web page from the Columbus Regional Airport Authority website, showing non-stop destinations, which I printed.

5.    Attached hereto as Exhibit D is a true and correct copy of a web page from the Des Moines International Airport website, showing non-stop destinations, which I printed.

6.    Attached hereto as Exhibit E is a true and correct copy of a Mapquest.com inquiry I made for directions from Des Moines, Iowa to San Francisco, California, which I printed. Mapquest.com calculated the distance to be 1,801 miles.

7.    Attached hereto as Exhibit F is a true and correct copy of a Mapquest.com inquiry I made for directions from Cleveland, Ohio to San Francisco, California, which I printed. Mapquest.com calculated the distance to be 2,463 miles.

8.    Attached hereto as Exhibit G is a true and correct copy of a webpage from the Continental Airlines website, indicating the flight time from Cleveland, Ohio to San Francisco, California.

9.    Attached hereto as Exhibit H is a true and correct copy of a Mapquest.com inquiry I made for directions from Cleveland, Ohio to Columbus, Ohio, which I printed. Mapquest.com calculated the distance to be 142 miles.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108 2693
415 433 1940

DECLARATION OF RICHARD H. RAHM          2.          U.S.D.C. CASE NO. C3:07-CV-4928 SI

1        10.    Attached hereto as Exhibit I is a true and correct copy of a page from the

2    United States District Courts website indicating the caseload for the Northern District of California,

3    which I printed.

4        11.    Attached hereto as Exhibit J is a true and correct copy of a page form the

5    United States Courts website indicating the caseload for the Southern District of Ohio, which I

6    printed.

7        12.    Attached hereto as Exhibit K are true and correct copies of the California

8    Division of Labor Standards Enforcement ("DLSE") opinion letter, dated January 7, 1993, and

9    October 5, 1998, which I printed from the DLSE website.

10        I declare under penalty of perjury under the laws of the State of California and the

11    United States that the foregoing is true and correct.

12        Executed this 16th day of October, 2007 at San Francisco, California.

13

14

15

16        RICHARD H. RAHM

17

18

19    Firmwide:83297267.1 050511.1000

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108 2693
415 433 1940

DECLARATION OF RICHARD H. RAHM    3.    U.S.D.C. CASE NO. C3:07-CV-4928 SI

# EXHIBIT A

RICHARD H. RAHM, State Bar No. 130728
LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108.2693
Telephone:    415.433.1940
Facsimile:    415.399.8490

JAMES J. OH, IL State Bar No. 6196413
(*pro hac vice* application forthcoming)
LITTLER MENDELSON
A Professional Corporation
200 N. LaSalle Street
Suite 2900
Chicago, Illinois 60601
Tel: 312.372.5520
Fax: 312.372.7880

ANDREW J. VOSS, MN State Bar No. 0241556
(*pro hac vice* application forthcoming)
LITTLER MENDELSON
A Professional Corporation
80 South 8th Street
1300 IDS Center
Minneapolis, Minnesota 55402.2136
Tel: 612.630.1000
Fax: 612.630.9626

Attorneys for Defendant
NATIONWIDE MUTUAL INSURANCE
COMPANY

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK FOSTER, PHILLIP WAMOCK, individually and on behalf of all others similarly situated, and on behalf of the general public, | Case No. C3:07-CV-4928 |
| Plaintiff, | **DECLARATION OF TERESA WIENCEK IN SUPPORT OF NATIONWIDE'S MOTION TO TRANSFER VENUE** |
| v. | Date:    November 30, 2007<br>Time:    9:00 a.m.<br>Court:    10 |
| NATIONWIDE MUTUAL INSURANCE COMPANY, | Before the Honorable Susan Illston |
| Defendant. | |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DECLARATION OF TERESA WIENCEK                    U.S.D.C. CASE NO. C3:07-CV-4928 SI

1    I, Teresa Wiencek, hereby declare under perjury pursuant to 28 U.S.C. § 1746 that the

2    following is true and correct based upon personal knowledge:

3    1.    I am currently employed by Nationwide Mutual Insurance Company ("Nationwide" or the

4    "Company") as the Vice President of Human Resources.

5    2.    As Vice President of Human Resources, I have access to records describing the numbers

6    and locations of Nationwide's employees.   I am familiar with the duties, responsibilities, and

7    reporting structure for numerous categories of employees, including Special Investigators.   I am also

8    familiar with the Company's procedures related to human resources and the processing of payroll,

9    the location of personnel and payroll records, and the identities of other individuals with specific

10   knowledge regarding Nationwide's policies and procedures.

11   3.    Nationwide is a national property and casualty insurance company offering a full range of

12   insurance products for its customers' homes, automobiles, and business property.   Its corporate

13   headquarters is at One Nationwide Plaza, Columbus Ohio 43215-2220.   I work out of the

14   Company's corporate office.

15   4.    Nationwide employs a group of individuals known as Special Investigators.   From 2003 to

16   the present, Nationwide has, to the best of my knowledge, employed a total of 355 Special

17   Investigators in thirty-eight states as follows:   Alabama (8), Arkansas (4), Arizona (9), California

18   (36), Colorado (3), Connecticut (7), Delaware (4), Florida (32), Georgia (7), Iowa (9), Illinois (3),

19   Indiana (5), Kansas (1), Kentucky (3), Maryland (18), Michigan (13), Minnesota (3), Missouri (2),

20   Mississippi (5), North Carolina (19), Nebraska (3), New Hampshire (1), New Jersey (1), Nevada (4),

21   New York (28), Ohio (24), Oregon (4), Pennsylvania (28), Rhode Island (3), South Carolina (8),

22   Tennessee (9), Texas (19), Utah (2), Virginia (19), Vermont (1), Washington (4), Wisconsin (1) and

23   West Virginia (5).

24   5.    Nationwide's general human resources and pay policies and practices are developed and

25   maintained by management and executive-level employees, from the following three departments,

26   all of which are based in Columbus: Office of Associate Relations, Performance & Rewards, and

27   PCIO Human Resources.

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

1    6.    Payroll records are processed and kept at Nationwide's headquarters, and employee pay is

2    prepared at and distributed from there as well.

3    7.    Policies related to the duties, responsibilities of Special Investigators, such as their job

4    descriptions, training materials, policies they are charged with enforcing, and documents supporting

5    their exempt status are likewise developed and maintained at Nationwide's corporate headquarters in

6    Columbus.

7    8.    Nationwide management and executive-level employees who: (a) develop and prepare

8    Nationwide's pay policies and practices; (b) calculate or approve rates of pay for non-exempt

9    employees such as Special Investigators; (c) have knowledge of the duties, responsibilities, training,

10   and exempt status of Special Investigators, generally work at the Company's headquarters in

11   Columbus.    For example, the following employees who work at Nationwide's corporate

12   headquarters possess the following categories of knowledge about Special Investigators:

| NAME | TITLE | SUBJECT MATTER |
|---|---|---|
| Teresa Wiencek | Vice President of Human Resources | Duties, responsibilities, and reporting structure for Special Investigators; procedures related to human resources and the processing of payroll, the location of personnel and payroll records; identities of individuals with specific knowledge regarding Nationwide's policies and procedures; exempt classification for Special Investigators |
| Kevin Hilyard[1] | Vice President of Claims (including responsibility for Special Investigation Unit) | Special Investigator duties and responsibilities |
| Lee S. Herman | Special Investigation Unit Officer | Special Investigator duties and responsibilities; development of training materials for Special Investigators; policies that Special Investigators are charged with enforcing |
| Janelle Mikusa | Human Resource Director | Duties, responsibilities, and reporting structure for Special Investigators; review of Special Investigator job titles; exempt classification for Special Investigators |
| Peter Hendey | Officer of Associate Relations | General human resources and pay policies; compensation-related complaints by Special Investigators |
| Bradley Gutcher | SIU Director | Special Investigator duties and |

---

[1] Mr. Hilyard is currently transitioning from New York to Columbus and is expected to be situated in Columbus long before his testimony is required.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108 2693
415.433.1940

DECLARATION OF TERESA WIENCEK            3.            U.S.D.C. CASE NO. C3:07-CV-4928 SI

| | | responsibilities; review of Special Investigator job titles; training provided to Special Investigators |
|---|---|---|
| Richard Gandarillas | Compensation Director | Pay bands, market reference value, and job description for Special Investigators; review of Special Investigator job titles; exempt classification for Special Investigators |

9.    In addition, the following Company employees with knowledge about the Special Investigator job do not work at the corporate headquarters in Columbus but work much nearer to Columbus than to San Francisco:

| NAME and LOCATION | TITLE | SUBJECT MATTER |
|---|---|---|
| Ray Albertini (Cleveland, OH) | Former Head of Special Investigation Unit | Special Investigator Duties and Responsibilities; development of training materials for Special Investigators; policies that Special Investigators are charged with enforcing |
| Amy Spellman (Des Moines, IA) | HR Specialist | Special Investigator duties and responsibilities; review of Special Investigator job titles; exempt classification for Special Investigators |
| John Cordes (Des Moines, IA) | Compensation Consultant | Pay bands, market reference value, and job description for Special Investigators; review of Special Investigator job titles; exempt classification for Special Investigators |
| Wade Wickre (Gainesville, FL) | SIU Director | Duties, responsibilities, and reporting structure for Special Investigators; policies that Special Investigators are charged with enforcing |

10.    Nationwide has a regular air shuttle from Des Moines to Columbus that could provide transportation for Ms. Spellman and Mr. Cordes.  It would be approximately a two and half hour drive for Mr. Albertini from Cleveland to Columbus.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415.433.1940

DECLARATION OF TERESA WIENCEK        4.        U.S.D.C. CASE NO. C3:07-CV-4928 SI

11.    Attendance at hearings and a lengthy trial in San Francisco not only will require these key executives and managers to be away from their work and homes, but also would substantially disrupt Nationwide's business operations and the personal schedules of the witnesses.  Because these individuals hold key responsibilities for the operation of the Company, scheduling time away from work would be difficult because their responsibilities would have to be delegated to others, or simply not performed at all.

12.    The disruption to Nationwide's business operations and the cost of the transportation, lodging and meals for its witnesses would be reduced if this case were transferred to the Southern District of Ohio.

I declare under penalty of perjury that the foregoing is true and correct.

Teresa Wiencek

Dated:  *10 - 15 - 2007*

Firmwide:83245950.1

DECLARATION OF TERESA WIENCEK
(NO. C 07 4928)                                        5.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415 433 1940

# EXHIBIT B



**Notes:**
Only text visible within note field will print.

**Start:** Columbus, OH US

**End:** San Francisco, CA US

| Directions | Distance |
|---|---|
| **Total Est. Time:** 35 hours, 20 minutes     **Total Est. Distance:** 2453.80 miles | |
| **1:** Start out going WEST on E STATE ST toward S HIGH ST. | <0.1 miles |
| **2:** Turn LEFT onto S HIGH ST. | 0.3 miles |
| **3:** Turn RIGHT onto W MOUND ST. | 0.1 miles |
| **4:** Merge onto I-70 W via the ramp on the LEFT toward DAYTON (Crossing into INDIANA). | 175.2 miles |
| **5:** Merge onto I-70 W via EXIT 110B toward ST. LOUIS. | 5.8 miles |
| **6:** Merge onto AIRPORT EXPY via EXIT 75 toward INDPLS. INTL. AIRPORT. | 1.3 miles |
| **7:** Merge onto I-465 N / I-74 W. | 5.4 miles |
| **8:** Merge onto I-74 W via EXIT 16B toward PEORIA ILL. (Crossing into ILLINOIS). | 165.8 miles |
| **9:** Merge onto I-74 W via EXIT 163 toward PEORIA. | 114.0 miles |
| **10:** I-74 W becomes I-80 W (Passing through IOWA- NEBRASKA- and WYOMING- then crossing into UTAH). | 1249.9 miles |
| **11:** Merge onto I-80 W via EXIT 308 toward RENO / S.L. INT'L AIRPORT (Portions toll) (Passing through NEVADA- then crossing into CALIFORNIA). | 734.2 miles |
| **12:** Merge onto US-101 N / CENTRAL FWY toward MISSION ST. | 0.6 miles |
| **13:** Take the US-101 N / MISSION ST exit- EXIT 434A- toward G G BR. | 0.1 miles |
| **14:** Turn SLIGHT RIGHT onto MISSION ST / US-101 N. Continue to follow US-101 N. | 0.3 miles |
| **15:** Turn RIGHT onto MARKET ST. | <0.1 miles |
| **16:** Turn RIGHT onto 11TH ST. | <0.1 miles |
| **17:** End at **San Francisco, CA US** | |
| **Total Est. Time:** 35 hours, 20 minutes     **Total Est. Distance:** 2453.80 miles | |

All rights reserved. Use Subject to License/Copyright
These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

# EXHIBIT C



COLUMBUS REGIONAL
AIRPORT AUTHORITY



# Airline & Flight Information

**Airline Info**
Airline Contact Info
Airlines By Concourse

**Flight Info**
FlyColumbus.com
Real Time Flight Information
Non-stop Destinations
Flight Schedules

**Stats**
Quarterly Report
Monthly Stats

**Security**
Security Tips

## Non-stop Destinations

Port Columbus offers many daily flights to business and leisure markets throughout th
flight schedule.

| | Air Canada Jazz | American | Continental | Delta | JetBlue | Midwest Connect | Northwest | Skybus* | Southwest |
|---|---|---|---|---|---|---|---|---|---|
| Atlanta, GA | | | | 8 | | | | | |
| Baltimore, MD | | | | | | | | | 5 |
| Bellingham, WA (Seattle/Vancouver) | | | | | | | | 1 | |
| Boston, MA | | 1 | | 3 | 1 | | | | |
| Cancun, Mexico (weekly) | | | | | | | | | |
| Charlotte, NC | | | | | | | | | |
| Chicago,IL (Midway) | | | | | | | | | 7 |
| Chicago, IL (O'Hare) | | 10 | | | | | | | |
| Cincinnati, OH | | | | 7 | | | | | |
| Cleveland, OH | | | 4 | | | | | | |
| Dallas, TX | | 5 | | | | | | | |
| Denver, CO | | | | | | | | | |
| Detroit, MI | | | | | | | 6 | | |
| Fort Lauderdale, FL | | | | 1 | | | | 2 | |
| Fort Myers, FL | | | | 1 | | | | | |
| Greensboro, NC | | | | | | | | 1 | |
| Hartford, CT | | | | 2 | | | | | |
| Houston, TX | | 5 | | | | | | | |
| Kansas City, MO | | | | | | 2 | | 1 | |
| Las Vegas, NV | | | | | | | | | 2 |
| Los Angeles, CA (LAX) | | | | 1 | | | | | |
| Los Angeles, CA | | | | | | | | | |

| | Air Canada Jazz | American | Continental | Delta | JetBlue | Midwest Connect | Northwest | Skybus* | Southwest |
|---|---|---|---|---|---|---|---|---|---|
| (Burbank, CA) | | | | | | | | 2 | |
| Memphis, TN | | | | | | | 3 | | |
| Miami, FL | | 1 | | | | | | | |
| Milwaukee, WI | | | | | | 4 | | | |
| Minneapolis, MN | | | | | | | 3 | | |
| Nashville, TN | | | | | | | | | 2 |
| New York, NY (Kennedy) | | | | 4 | 4 | | | | |
| New York, NY (LaGuardia) | | 4 | | 4 | | | | | |
| New York, NY (Newark) | | | 6 | | | | | | |
| Oakland, CA | | | | | | | | 1 | |
| Orlando, FL | | | | 3 | | | | | 3 |
| Philadelphia, PA | | | | | | | | | 3 |
| Phoenix, AZ | | | | | | | | | 1 |
| Portsmouth, NH (Boston) | | | | | | | | 2 | |
| Raleigh/Durham, NC | | 2 | | | | | | | |
| Richmond, VA | | | | | | | | 1 | |
| San Diego, CA | | | | | | | | 1 | |
| Salt Lake City, UT | | | | 1 | | | | | |
| Springfield/Chicopee, MA (Hartford) | | | | | | | | 1 | |
| St. Augustine, FL (Jacksonville) | | | | | | | | 1 | |
| St Louis, MO | | 4 | | | | | | | 1 |
| Tampa/ St. Petersburg, FL | | | | 1 | | | | | 2 |
| Toronto, Canada | 3 | | | | | | | | |
| Washington, DC (Dulles) | | | | | | | | | |
| Washington, DC (National) | | | | 2 | | | | | |
| Totals | 3 | 27 | 15 | 38 | 5 | 6 | 12 | 14 | 26 |

**SKYBUS NOTE:**

Four new nonstop flights from Columbus - effective December 5.

Case 3:07-cv-04928-SI    Document 15-2    Filed 10/16/2007    Page 15 of 59

**New Cities:**

- Chattanooga
- Gulfport-Biloxi/New Orleans Area
- Milwaukee
- Punta Gorda/Ft. Myers (two flights daily)

**Now two flights a day effective December 17:**

- Jacksonville/Daytona Beach (St. Augustine)

About CRAA | News & Publications | Construction & Development | Commitment to Div‹
Doing Business with CRAA | Noise Program | Employment Opportunities | Contact Us |

Copyright 2004 Columbus Regional Airport Authority

# EXHIBIT D

Travel Info                    DES M(
                               Internau

| Home | Parking | Weather | Flight On Time | Travel Info | Business Services | Community Info | What's New | About U |

## "19" Non-Stop Destinations



- Atlanta
  3 non-stops per/day to Atlanta on ComAir/Delta Starting in September '06, 4 flights per/day!
- Chicago
  6 non-stops to Chicago O'Hare Field Sunday-Friday and 5 on Saturday with American Eagle, 6 non-stops daily to Chicago O'Hare on United Airlines
- Cincinnati
  5 non-

- Milwaukee
  3 daily non-stops Monday-Friday, 2 on Saturday/Sunday all with Midwest Airlines
- Minneapolis
  9 non-stops per-day Sunday-Friday, 8 on Saturday, all on Northwest Airlines
- New York City
  1 non-stop per/day (except Sunday) on American Eagle
- Orlando

Case 3:07-cv-04928-SI    Document 15-2    Filed 10/16/2007    Page 18 of 59

stops per/day on ComAir/Delta

- Cleveland
  2 non-stops per day on Continental Airlines starting June 2008
- Dallas
  5 non-stops Sunday-Friday, and 4 non-stops Saturday on American Eagle
- Denver
  6 non-stops per/day on United Airlines
- Detroit
  4 non-stops per/day on Northwest
- Houston
  3 non-stops per/day on Continental Airlines
- Las Vegas
  1 non-stop per/day on Allegiant Air 4-days per week, Thursday- Friday and Sunday - Monday.
- Memphis
  3 non-stops per/day on Northwest Airlines

One nonstop 4-days per/week on Allegiant Air

- Phoenix
  2 non-stops everyday on U S Airways
- Salt Lake City
  1 non-stop a day on Delta/SkyWest
- St. Louis
  3 non-stops Sunday-Friday, 2 on Saturday with American Eagle
- Tampa Bay/
  St. Petersburg
  2 non-stops Wednesday and Sundays on Allegiant Air
- Washington DC
  1 non-stop per/day on Northwest Airlines

# EXHIBIT E



**Notes:**

Only text visible within note field will print.

**Start:**  **Des Moines, IA US**

**End:**  **San Francisco, CA US**

| Directions | Distance |
|---|---|

**Total Est. Time:** 25 hours, 17 minutes      **Total Est. Distance:** 1801.50 miles

**1:** Start out going SOUTH on PENNSYLVANIA AVE toward E UNIVERSITY AVE.      0.1 miles

**2:** Turn SLIGHT RIGHT.      0.1 miles

**3:** Merge onto I-235 W.      9.1 miles

**4:** I-235 W becomes I-80 W (Passing through NEBRASKA and WYOMING- then      1056.4 miles
crossing into UTAH).

**5:** Merge onto I-80 W via EXIT 308 toward RENO / S.L. INT'L AIRPORT (Portions      734.2 miles
toll) (Passing through NEVADA- then crossing into CALIFORNIA).

**6:** Merge onto US-101 N / CENTRAL FWY toward MISSION ST.      0.6 miles

**7:** Take the US-101 N / MISSION ST exit- EXIT 434A- toward G G BR.      0.1 miles

**8:** Turn SLIGHT RIGHT onto MISSION ST / US-101 N. Continue to follow US-101      0.3 miles
N.

**9:** Turn RIGHT onto MARKET ST.      <0.1 miles

**10:** Turn RIGHT onto 11TH ST.      <0.1 miles

**11:** End at **San Francisco, CA US**

**Total Est. Time:** 25 hours, 17 minutes      **Total Est. Distance:** 1801.50 miles

All rights reserved. Use Subject to License/Copyright
These directions are informational only. No representation is made or warranty given as to their content, road
conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no
responsibility for any loss or delay resulting from such use.

# EXHIBIT F



**Notes:**
Only text visible within note field will print.

**Start:** **Cleveland, OH US**

**End:** **San Francisco, CA US**

| Directions | Distance |
| --- | --- |

**Total Est. Time:** 35 hours, 29 minutes     **Total Est. Distance:** 2463.08 miles

**1:** Start out going SOUTHEAST on W 3RD ST toward W SUPERIOR AVE / US-20 / US-322 / US-6.     <0.1 miles

**2:** Turn LEFT onto W SUPERIOR AVE / US-20 / US-322 / US-6.     <0.1 miles

**3:** Turn RIGHT onto PUBLIC SQ / US-20 E.     <0.1 miles

**4:** Turn RIGHT onto ONTARIO ST / US-422 / OH-14 / OH-8 / OH-87. Continue to follow US-422 / OH-14 / OH-8 / OH-87.     0.5 miles

**5:** Merge onto I-90 W toward I-71.     1.0 miles

**6:** Merge onto I-90 W via EXIT 170B toward TOLEDO (Portions toll) (Crossing into INDIANA).     306.2 miles

**7:** Merge onto I-80 W via EXIT 21 toward IN-51 S (Portions toll) (Crossing into ILLINOIS).     169.4 miles

**8:** Merge onto I-280 W (Crossing into IOWA).     26.6 miles

**9:** Merge onto I-80 W via the exit on the LEFT toward DES MOINES (Passing through NEBRASKA and WYOMING- then crossing into UTAH).     1223.3 miles

**10:** Merge onto I-80 W via EXIT 308 toward RENO / S.L. INT'L AIRPORT (Portions toll) (Passing through NEVADA- then crossing into CALIFORNIA).     734.2 miles

**11:** Merge onto US-101 N / CENTRAL FWY toward MISSION ST.     0.6 miles

**12:** Take the US-101 N / MISSION ST exit- EXIT 434A- toward G G BR.     0.1 miles

**13:** Turn SLIGHT RIGHT onto MISSION ST / US-101 N. Continue to follow US-101 N.     0.3 miles

**14:** Turn RIGHT onto MARKET ST.     <0.1 miles

**15:** Turn RIGHT onto 11TH ST.     <0.1 miles

**16:** End at **San Francisco, CA US**

**Total Est. Time:** 35 hours, 29 minutes     **Total Est. Distance:** 2463.08 miles

All rights reserved. Use Subject to License/Copyright
These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

# EXHIBIT G





SEARCH FLIGHTS → CHOOSE FLIGHTS → ● TICKET DETAILS → ○ TRAVELER INFORMATION → ○ COMPLETE PURCHASE →

# Review Ticket Details

**Price Details:**

| | |
|---|---|
| 1 Adults (age 18 to 64) | $434.00 |
| Additional Taxes/Fees | $20.80 |
| **Total Price** | **$454.80** |

PAY LATER    No Payments for Days
Later    *subject to credit approval

**Flight Details:**

| Depart:<br>**9:00 a.m.**<br>**Wed., Oct. 31, 2007**<br>Cleveland, OH (CLE) | Arrive:<br>**11:14 a.m.**<br>**Wed., Oct. 31, 2007**<br>San Francisco, CA (SFO) | Travel<br>Time:<br>**5 hr 14<br>mn** | OnePass Miles/<br>Elite Qualification:<br>**2,161 /100%** | Flight: **CO555**<br>Aircraft: Boei<br>Fare Class: Ec<br>Meal: Snack<br>**No Special M** |
| Depart:<br>**12:20 p.m.**<br>**Wed., Nov. 7, 2007**<br>San Francisco, CA (SFO) | Arrive:<br>**8:04 p.m.**<br>**Wed., Nov. 7, 2007**<br>Cleveland, OH (CLE) | Travel<br>Time:<br>**4 hr 44<br>mn** | OnePass Miles/<br>Elite Qualification:<br>**2,161 /100%** | Flight: **CO254**<br>Aircraft: Boei<br>Fare Class: Ec<br>Meal: Snack<br>**No Special M** |

> Change Flights or Start New Search

**Rules and Restrictions:**

- **This ticket is non-refundable. If you cancel your reservation prior to scheduled depart subject to applicable rules, change the ticket for travel up to one year after the ticket issued; otherwise the ticket has no value.**
- Read the penalty rules for changes and cancellations associated with this fare.
- Read the complete rules and restrictions applicable for this fare.
- Read the Electronic Travel Certificate terms and conditions (if applicable).
- Non-Elite OnePass members traveling on Y, H, K, N, or B (or equivalent) fares are eligible for m upgrades within or between the 48 contiguous U.S., Alaska and Canada.
- The free baggage allowance is two checked bags not to exceed 50 lbs (22.7 kg) [70 lbs (32 kg) customers] and 62 linear inches (157 cm) (total length + width + height) per piece. Review our checked baggage policy
- Review our complete baggage policy

☐ **I accept the fare rules associated with this non-refundable ticket. Any changes made to this result in additional fees.**

| **OnePass Members** | **Continue without Signing In** |
|---|---|
| To continue the booking process using your saved preferences, please sign in to your account now. See benefits of signing in to your account. | Click continue below to proceed with the bc process. |
| OnePass Number or Username: | You'll have the opportunity to enroll in our flyer program at the end of the booking pro wish. |
| PIN or Password:<br><br>Don't know your PIN?<br>Please see Forgot Your PIN. | **If you are a OnePass member** and do nc sign in to your account, you can enter your number on the next page for mileage credi |

☐ Remember Me

🔒 Security Info

Note: OnePass frequent flyer mileage information is provided as a convenience to OnePass members. Elite miles is the percentage of OnePass Elite status when booked on continental.com. Actual flown miles will be posted to your account. Fare class, Elite and other promotional bonuses the totals listed. A minimum of 500 OnePass miles is earned for flights less than 500 miles in distance. For Amtrak train segments 250 OnePass Economy Class and 325 OnePass miles for First Class.



Business Services | Cargo | Careers
Contract of Carriage | Customer First | Legal Information | Privacy Policy | Site Map | Travel Agents
Copyright © 2007 Continental Airlines, Inc.
All rights reserved.

# EXHIBIT H



**Notes:**
Only text visible within note field will print.

**Start:** **Cleveland, OH US**

**End:** **Columbus, OH US**

## Directions                                                                Distance

**Total Est. Time:** 2 hours, 19 minutes      **Total Est. Distance:** 142.35 miles

**1:** Start out going SOUTHEAST on W 3RD ST toward W SUPERIOR AVE / US-20 /          <0.1 miles
US-322 / US-6.

**2:** Turn LEFT onto W SUPERIOR AVE / US-20 / US-322 / US-6.                         <0.1 miles

**3:** Turn RIGHT onto PUBLIC SQ / US-20 E.                                           <0.1 miles

**4:** Turn RIGHT onto ONTARIO ST / US-422 / OH-14 / OH-8 / OH-87. Continue to        0.5 miles
follow US-422 / OH-14 / OH-8 / OH-87.

**5:** Merge onto I-90 W toward I-71.                                                 1.0 miles

**6:** Keep LEFT to take I-71 S toward COLUMBUS.                                      139.3 miles

**7:** Take the BROAD ST / US-40 exit- EXIT 108B.                                     0.1 miles

**8:** Turn RIGHT onto E BROAD ST / US-40 / US-62 / OH-16.                            0.7 miles

**9:** Turn LEFT onto S 3RD ST / US-33 E / US-23 S / US-62 S / OH-3 S.                0.1 miles

**10:** Turn RIGHT onto E STATE ST.                                                   <0.1 miles

**11:** End at **Columbus, OH US**

**Total Est. Time:** 2 hours, 19 minutes      **Total Est. Distance:** 142.35 miles

All rights reserved. Use Subject to License/Copyright
These directions are informational only. No representation is made or warranty given as to their content, road
conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no
responsibility for any loss or delay resulting from such use.

# EXHIBIT I

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **CALIFORNIA NORTHERN** | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | Numerical Standing | |
| | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | 8,683 | 6,362 | 6,727 | 6,919 | 7,887 | 6,841 | U.S. | Circuit |
| | Terminations | 6,983 | 6,966 | 6,471 | 7,094 | 6,675 | 6,069 | | |
| | Pending | 8,157 | 6,557 | 7,267 | 7,567 | 7,958 | 6,928 | | |
| | % Change in Total Filings — Over Last Year | | 36.5 | | | | | 4 | 1 |
| | % Change in Total Filings — Over Earlier Years | | | 29.1 | 25.5 | 10.1 | 26.9 | 10 | 2 |
| Number of Judgeships | | 14 | 14 | 14 | 14 | 14 | 14 | | |
| Vacant Judgeship Months** | | .0 | .0 | .0 | 3.1 | 12.0 | 3.0 | | |
| ACTIONS PER JUDGESHIP | FILINGS — Total | 620 | 455 | 480 | 494 | 563 | 489 | 11 | 3 |
| | FILINGS — Civil | 558 | 390 | 413 | 424 | 510 | 439 | 6 | 2 |
| | FILINGS — Criminal Felony | 37 | 39 | 44 | 47 | 42 | 50 | 82 | 12 |
| | FILINGS — Supervised Release Hearings** | 25 | 26 | 23 | 23 | 11 | - | 36 | 12 |
| | Pending Cases | 583 | 468 | 519 | 541 | 568 | 495 | 12 | 2 |
| | Weighted Filings** | 621 | 543 | 581 | 631 | 598 | 610 | 5 | 2 |
| | Terminations | 499 | 498 | 462 | 507 | 477 | 434 | 28 | 5 |
| | Trials Completed | 8 | 10 | 10 | 11 | 11 | 11 | 91 | 14 |
| MEDIAN TIMES (months) | From Filing to Disposition — Criminal Felony | 11.2 | 12.6 | 11.1 | 11.7 | 11.8 | 10.1 | 75 | 11 |
| | From Filing to Disposition — Civil** | 7.4 | 9.8 | 8.2 | 10.6 | 9.5 | 9.1 | 11 | 3 |
| | From Filing to Trial** (Civil Only) | 25.0 | 28.0 | 22.5 | 30.3 | 23.5 | 22.7 | 41 | 5 |
| OTHER | Civil Cases Over 3 Years Old** — Number | 528 | 530 | 430 | 377 | 475 | 335 | | |
| | Civil Cases Over 3 Years Old** — Percentage | 7.3 | 9.5 | 6.9 | 5.7 | 6.7 | 5.6 | 60 | 7 |
| | Average Number of Felony Defendants Filed Per Case | 1.5 | 1.5 | 1.4 | 1.5 | 1.4 | 1.5 | | |
| | Jurors — Avg. Present for Jury Selection | 59.09 | 55.21 | 61.19 | 65.00 | 66.42 | 60.46 | | |
| | Jurors — Percent Not Selected or Challenged | 43.2 | 31.0 | 48.9 | 40.9 | 47.2 | 42.2 | | |

| 2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 7812 | 128 | 2118 | 1540 | 105 | 23 | 487 | 577 | 481 | 464 | 745 | 105 | 1039 |
| Criminal* | 507 | 16 | 58 | 134 | 70 | 89 | 18 | 28 | 8 | 9 | 15 | 27 | 35 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

# EXHIBIT J

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| **OHIO SOUTHERN** | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | 3,066 | 3,223 | 3,466 | 3,254 | 3,482 | 3,101 | | | |
| | Terminations | 3,296 | 3,392 | 3,177 | 3,292 | 3,224 | 3,192 | | | |
| | Pending | 3,422 | 3,637 | 3,788 | 3,501 | 3,568 | 3,392 | | | |
| | % Change in Total Filings — Over Last Year | | -4.9 | | | | | | 52 | 5 |
| | % Change in Total Filings — Over Earlier Years | | | -11.6 | -5.8 | -12.0 | -1.1 | | 53 | 5 |
| Number of Judgeships | | 8 | 8 | 8 | 8 | 8 | 8 | | | |
| Vacant Judgeship Months** | | 7.0 | 10.0 | .2 | 5.5 | 14.6 | .0 | | | |
| ACTIONS PER JUDGESHIP | FILINGS — Total | 383 | 403 | 434 | 407 | 435 | 388 | | 61 | 7 |
| | FILINGS — Civil | 297 | 319 | 358 | 338 | 363 | 347 | | 52 | 7 |
| | FILINGS — Criminal Felony | 62 | 60 | 56 | 48 | 46 | 41 | | 56 | 6 |
| | FILINGS — Supervised Release Hearings** | 24 | 24 | 20 | 21 | 26 | - | | 39 | 2 |
| | Pending Cases | 428 | 455 | 474 | 438 | 446 | 424 | | 30 | 3 |
| | Weighted Filings** | 437 | 483 | 516 | 479 | 497 | 450 | | 45 | 4 |
| | Terminations | 412 | 424 | 397 | 412 | 403 | 399 | | 53 | 6 |
| | Trials Completed | 20 | 21 | 19 | 17 | 16 | 11 | | 42 | 6 |
| MEDIAN TIMES (months) | From Filing to Disposition — Criminal Felony | 9.0 | 8.0 | 7.6 | 7.4 | 7.7 | 7.2 | | 48 | 4 |
| | From Filing to Disposition — Civil** | 12.6 | 11.3 | 12.1 | 11.9 | 11.3 | 11.4 | | 83 | 6 |
| | From Filing to Trial** (Civil Only) | 27.0 | 32.0 | 26.0 | 25.7 | 23.0 | 25.7 | | 54 | 6 |
| OTHER | Civil Cases Over 3 Years Old** — Number | 240 | 198 | 212 | 201 | 206 | 244 | | | |
| | Civil Cases Over 3 Years Old** — Percentage | 8.3 | 6.4 | 6.4 | 6.4 | 6.4 | 7.9 | | 67 | 9 |
| | Average Number of Felony Defendants Filed Per Case | 1.3 | 1.6 | 1.5 | 1.4 | 1.4 | 1.4 | | | |
| | Jurors — Avg. Present for Jury Selection | 50.60 | 44.80 | 27.75 | 31.92 | 38.70 | 32.86 | | | |
| | Jurors — Percent Not Selected or Challenged | 48.6 | 34.3 | 33.3 | 37.2 | 33.4 | 33.8 | | | |

| 2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2374 | 232 | 97 | 295 | 55 | 20 | 291 | 313 | 164 | 114 | 568 | 19 | 206 |
| Criminal* | 490 | 13 | 125 | 11 | 108 | 102 | 24 | 31 | 21 | 16 | 3 | 8 | 28 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

# EXHIBIT K

STATE OF CALIFORNIA                                                          PETE WILSON, Governor

DEPARTMENT OF INDUSTRIAL RELATIONS
**DIVISION OF LABOR STANDARDS ENFORCEMENT**
*LEGAL SECTION*
455 Golden Gate Avenue, Room 3166
San Francisco, CA  94102
`·15) 703-4150`

.. THOMAS CADELL, JR., *Chief Counsel*



January 7, 1993


William Cochran-Bond, Esq.
Proskauer, Rose, Goetz & Mendelsohn
2121 Avenue of The Stars, Suite 2700
Los Angeles, CA  90067-5010


      Re:  **Exempt Employees - "Salary Basis Test"**


Dear Mr. Cochran-Bond:

    The Labor Commissioner has asked me to respond to your letter of November 2, 1992, which was received in this office by Facsimile on December 7, 1992.

    In your letter you discuss the use of the federal "salary basis test" which is utilized by the U.S. Department of Labor to determine exemptions under the Fair Labor Standards Act and the applicability of that test to California overtime requirements. You correctly point out in your letter that there is no equivalent test under state law. Thus, the result of the *Abshire* case does not affect the enforcement of the California Industrial Welfare Orders. Having said this, however, we feel that an explanation as to why this is so is in order.

    We feel that your letter raises questions which many California employers have puzzled over. This is particularly true since the adoption by the IWC of the "Learned and Artistic" exemption in some of the Orders. For that reason, the Division will use your letter as a vehicle to clarify the position of the Division of Labor Standards Enforcement regarding exemptions.

    The question of the applicability of the federal caselaw (and in some instances, the federal regulations[1]) dealing with the issue

---

[1]    In the case of *Alcala v. Western Ag Enterprises* (1986) 182 Cal.App.3d 546, the court noted that California's overtime laws are "closely modeled after (although they do not duplicate) section 7(a)(1) of the Fair Labor Standards Act." The court noted that when California laws are patterned on federal statutes and that the federal court authorities interpreting those federal <u>statutes</u> provide persuasive guidance to state courts.  However, the same court noted that "federal guidelines" (i.e., regulations) may not be considered definitive.  See discussion of this issue, *infra*.

William Cochran-Bond, Esq.
January 7, 1993
Page 2

of administrative, managerial and professional exemptions to the California IWC Orders is frequently encountered.  As we will explain, the federal law differs substantially from the state law in this area.  However, we must emphasize that, of course, the California employer must, however, comply with the more stringent law.

Applicable Language

Federal Law

    The Fair Labor Standards Act provides, at 29 U.S.C. §213(a)(1), that the minimum wage and overtime provisions of the Act (29 U.S.C. §§ 206 and 207) do not apply with respect to:

> Any employee *employed in* a bona fide executive, administrative, or professional *capacity* (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor], subject to the provisions of subchapter II of chapter 5 of Title 5, except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities)..."

State Law

    The California Industrial Welfare Commission Orders (Section 1(B)(1))[2] provides the following exemption for administrative, executive or professional employees:

> (A) Provisions of Sections 3 through 12 shall not apply to persons employed in administrative, executive, or professional capacities. No person shall be considered to be employed in an administrative, executive, or professional capacity unless one of the following conditions prevails:

> (1) The employee is engaged in work which is primarily

--------

[2]    There are fifteen separate Orders and these orders do not always follow the exact numerical order from one to another.

William Cochran-Bond, Esq.
January 7, 1993
Page 3

intellectual, managerial, or creative, and which requires
exercise of discretion and independent judgment, and for
which the remuneration[3] is not less than ($900 or $1150)
per month...

As you can see, the language of the FLSA differs substantially
from that of the IWC Orders. The FLSA simply requires that the em-
ployee be "employed in the capacity" of an executive while the IWC
Orders require that (in addition to the salary [remuneration] test
[$900 or $1150]) the person be "engaged in work which is primarily[4]
intellectual, managerial, or creative, and which requires exercise
of discretion and independent judgment." However, probably the
most important feature of the FLSA which sets it apart from the
provisions of the IWC Orders is the fact that Congress allowed the
Secretary of Labor to "define and delimit" the terms used[5]. In Cal-
ifornia, on the other hand, the IWC has defined the terms and the

---

[3]    The term used by the IWC to define the amount the employee must be com-
pensated in order to qualify for the exemption is "remuneration". Histor-
ically, the DIW (the predecessor agency mandated to enforce the IWC Orders
until consolidated with DLLE in 1975) and DLSE have construed the use of
this word to mean that the Commission did not intend to set a "salary"
which must be paid in cash, but intended to include all wages and benefits
not required by law. As an example, if an employee receives a salary of
$600.00 per month in cash wages and the use of an apartment which has a
value of $600.00 per month, the employee would meet the "remuneration"
test. (If the employee is a resident apartment manager, consideration
must be given to the provisions of Labor Code §1182.8.)

[4]    Section 2 of the IWC Orders defines the word "primarily" to mean "more
than one-half". Note that the word "primary" is used in the federal
regulations but is not defined. The federal courts have defined "primary"
for purposes of the federal regulations according to its dictionary
definition as "principal" or "chief" and held it did not seem appropriate
to attach a time criterion to the word as the regulations had done.

[5]    The Commission has provided permission to the DLSE to follow the rules
adopted by the Secretary of Labor in one area. The IWC in the orders
promulgated since July of 1988 has chosen to add the category "learned and
artistic" to the list of exempt occupations as an adjunct to the "profes-
sional" exemption which already existed. The Commission noted in its
"Statement of Basis" that the addition of this language [learned and
artistic] "would permit, but would not be limited to, use of the federal
guidelines for purposes of interpretation" of the category [professional].
The "learned and artistic" category has nothing to do with the managerial
category, however, and the IWC has not provided for the use of the federal
"guidelines" in other than the "professional/learned and artistic"
category.

William Cochran-Bond, Esq.
January 7, 1993
Page 4

provisions of Labor Code §1198.4 simply provide the Division with
the authority to interpret the orders for enforcement purposes.
(See, *Skyline Homes, Inc. v. Department of Industrial Relations*
(1985) 165 Cal.App.3d 239, 249)


The Federal Enforcement Policy

In response to the directive of Congress contained in section
29 U.S.C. §213(A)(1), the Department of Labor has promulgated
regulations at 29 C.F.R. §541 et seq. which "define" the terms
executive, administrative and professional and "delimit" those
terms. For instance, the federal regulations begin by describing
an individual "employed in a bona fide executive...capacity" as
one:

> (a) Whose primary duty consists of the management of the
> enterprise in which he is employed or of a customarily
> recognized department of (sic) subdivision thereof; ...

The federal regulations contain both a "long test" and a
"short test" for determining the exempt status of workers. The
"long test" has a threshold salary requirement ($155.00 per week)
and has three requirements in addition: (1) the employee must have
authority to hire or fire (or their recommendation in this regard
must be given weight); (2) they must customarily and regularly
exercise discretionary powers, and (3) they must not devote more
than 40 per cent of their time to activities not "closely related"
to their management duties. The short test looks initially to an
enhanced salary requirement (at least $250.00 per week) and
requires only that (1) the "primary duty" of the employee be
managerial, and (2) the employee must regularly direct the work of
at least two other employees. Under this test the allocation of
the employee's time is not in issue.

The use of the differing criteria depending on the amount of
the salary paid was a decision made by the DOL based upon enforce-
ment costs.[6] On the other hand, the IWC has no salary test (only
a "remuneration" test) in the Orders, and DLSE has not been given
discretion to set a salary test as has the Department of Labor.

---

[6]  The court addressed this issue in another case involving the same
employer: Donovan v. Burger King 675 F2d 516, 520 (2nd Cir.1983) and held
that "where salary is low and a substantial amount of time is spent on
non-exempt work, the inference that the employee is not an executive is
quite strong and the savings in enforcement costs afforded by the
mechanical test may offset whatever is lost in accuracy in aberrational
cases."

William Cochran-Bond, Esq.
January 7, 1993
Page 5

Therefore, it is impossible to utilize the federal regulations to
determine whether one is exempt under the IWC Orders. However,
even if we were not faced with the problem of the salary test to
determine which criteria should be used, the primary consideration
under either federal test is the "primary duty" of the worker while
under the IWC Orders the emphasis is upon the type of work the
employee is "engaged in".

The "primary duty" test as defined by the federal courts is
best summed up by the language in *Donovan v. Burger King*, 672 F.2d
221, 226 (1st Cir.1982), which held that "an employee can manage
while performing other work, and [that] this other work does not
negate the conclusion that his primary duty is management." That
same court, *Donovan v. Burger King* 672 F.2d at 226, stated that
"one can still be 'managing' if one is in charge, even while physi-
cally doing something else." (See also *Guthrie v. Lady Jane Col-
lieries, Inc.* 772 F.2d 1141, 1145) The *Burger King* court also
concluded that the use of the word "primary" in the federal regu-
lations was misleading for the reason that the dictionary defini-
tion of "primary" is "principal" or "chief" and it did not seem
appropriate to attach a time criterion to the word as the
regulations had done. (*Burger King, supra*, 672 F.2d at 226)[7]

The IWC Orders

Unlike the federal regulations which look to the "primary
duty" of the employee, the IWC Orders emphasize the type of work
the employee is **"primarily engaged in"**. In addition, the IWC
adopted a definition of the word "primarily" to mean "more than
one-half the employee's work time". While the IWC did not define
the term engage in, the dictionary definition is: "[T]o involve
oneself or become occupied; (American Heritage Dictionary, New
College ed., p. 433) Thus, the term "primary duty" used by the
federal government in the enforcement of the Fair Labor Standards
Act has no relationship to the term "engaged in" used by the DLSE
in enforcing the IWC Orders.

---

[7]     Even the federal regulations make it clear that "time" is not the only
standard which may be used to determine "primary duty". The regulations
set out a very broad meaning (in fact, subjective), of the term "primary
duty" which discusses an employee who spends more than 50 per cent of his
time in "production or sales work" but, while so engaged, supervises other
employees and does other managerial work. (29 C.F.R. §541.103) As will be
explained later, the DLSE policy is to give credit for all time spent in
managerial work; but not to credit time toward managerial time when the
actual work the employee is "engaged in" at the moment is production or
sales.

William Cochran-Bond, Esq.
January 7, 1993
Page 6

As the federal courts have pointed out, an employee whose "primary duty" is management may "manage" "even while physically doing something else" and such an arrangement would not be inconsistent with the federal regulations.  On the other hand, one may not be "engaged in" activities which are, for instance, managerial, as required by the IWC Orders, while at the same time "doing something else"; for it would be impossible "to involve oneself or become occupied" with managerial work while performing other duties. In other words, the IWC Orders require us to ascertain the type of work the individual is actually doing (e.g., "managerial" or "production or sales") and count the time on either side of the ledger.

The Division takes the position that <u>any time</u> related to management which may be logically separated from production or sales time must be counted toward the managerial duties of the employee.  Managerial duties must include supervision of at least two other employees with either the concomitant right to hire and fire or the right to recommend hiring and firing where such recommendation is given serious consideration. The "management" employee must regularly exercise discretion and, unlike the federal regulations, must also exercise <u>independent judgment</u>.[8]

Discretion implies that one has a choice to make but does not mean that the employee must enjoy the right to deviate from policies or procedures which allow for <u>some</u> discretion. However, if those policies and procedures so tightly control the manager's ability to make independent judgments, the manager will not be exempt.

Management duties may vary in specifics depending on the industry or the job classification, but they must include the above cited minimums.  Some examples of management duties which DLSE will accept are:

> Interviewing and selecting employees, training employees; setting of rates of pay and hours of work; directing the work of employees; maintaining production of sales records; appraising work performance; recommending changes in status; handling complaints; disciplining employees; planning work schedules; determining techniques to be used; apportioning work among workers; determining the type of materials, supplies, machinery or tools to be used; controlling the flow and distribution of materials, merchandise or supplies, and providing for the safety of the employees and their property.

---

[8]  The federal regulations require the exercise of "independent judgment" in order to qualify for exemption as an administrative employee, but, unlike the IWC Orders, there is no requirement that the employee exercise "independent judgment" to qualify for the executive (managerial) exemption.

William Cochran-Bond, Esq.
January 7, 1993
Page 7

The above list is not inclusive or exclusive. It must also be noted that one may be employed to perform some of the above while not employed as a manager or supervisor. For instance, some of the duties described above may be done by employees with no supervisory authority, such as personnel specialists or expediters. While those employees may (or may not) meet the criteria for exemption as administrative employees, they would not be exempt under the executive classification.

Any time the employee is "engaged in" such management duties must be counted. For instance, if the employee is employed as a manager of a shoe store, there are instances where the manager may, as a training tool, involve himself in the sale process. Such time should be counted toward managerial duties if, and only if, the trainee is not engaged in sales to another customer or other activities at the same time. If the sales work is truly training, the trainee should obviously be attentive to the training. The trainee would learn little if he were engaged in another sale to another customer at the same time. Such work would not be training, but the manager would be "engaged in" sales work.

The same situation could very well occur in almost any work setting. Explaining or demonstrating the work process to a single worker or a group of workers whose attention is directed to the demonstration would constitute training which may be a part of management duties.[9]

Any time taken away from production or sales work and devoted to any managerial work (no matter how short the time span may be) is considered managerial work and must be counted. However, the employee may not be "engaged in" two jobs at once. Thus, a worker employed in a manager position who simply answers a question while continuing to perform production or sales work is not "engaged in" managerial duties, but is "occupied or involved in" production work. On the other hand, the time that such an employee clearly disengages from the production or sales work to "engage in" managerial duties will be counted toward managerial duties.

Each particular situation must be decided on its own facts and this letter is designed to explain the overall policy of the DLSE in this regard. The important thing to remember is that the federal caselaw which interprets the Act (not the federal regulations or the federal cases interpreting those regulations) may be used as authority in construing the IWC Orders. (Alcala v. Western Ag Enterprises (1986) 182 Cal.App.3d 546) Since the federal cases in

---

[9]    If the employee is engaged as a trainer, however, such duties are simply part of the job classification and may not be counted toward managerial duties unless the other criteria involving supervision are present.

William Cochran-Bond, Esq.
January 7, 1993
Page 8

this area such as *Donovan v. Burger King, supra,* are not construing
the Act, but are construing the regulations, they are not on point.
Additionally, it must be made clear that imposition of any "salary
test" other than the "remuneration" test found in the Orders, is
beyond the jurisdiction of the DLSE and, thus, is beyond the juris-
diction of the California courts.

## Administrative Employees

Again, in determining the exemption status under the adminis-
trative category, the key phrase is "engaged in" and not, as under
the federal regulations, "primary duty" (29 C.F.R. §541.2(a)). With
this exception, the DLSE accepts the general definition of "admin-
istrative duties" set out by the DOL at 29 C.F.R. §541.2. General-
ly, administrative work must be nonmanual, related to management
policies or general business operations of the employer or the
employer's customers and must involve the customary and regular
exercise of discretion and independent judgment.  The Department of
Labor's regulations discuss the administrative exemption in detail
at 29 C.F.R. §541.201 through §541.208 and the DLSE adopts those
definitions. However, it must be noted that certain of the regula-
tions not contained within the above cited sections are inconsist-
ent with the IWC Orders and cannot be relied upon. For instance,
§541.211 through 541.214 discuss the salary test requirements which
the DOL has adopted for determining whether to use its "short test"
or the "long test".  Also, the language of §541.215 in not con-
sistent with the IWC Orders because the Orders do not address
"academic administrative personnel" and, under the IWC Orders, the
"profession" of teachers is subject to different rules and defini-
tions. (For instance, see IWC Order 5-89, Section 1(B)(2) and
Section 2(N) defining the word "teaching".)

"Titles" may be used by some employers to designate workers as
administrative employees who are then paid on a "salary" basis
without regard to overtime.  However, it is important to ascertain
the duties of the worker (and not simply the title) for purposes of
categorization.  For example, an assistant to a low level manager
may have duties which require the exercise of little or no indepen-
dent judgment or discretion.  Such employees are simply carrying
out day-to-day routine functions.  On the other hand, an adminis-
trative assistant to a top level manager of a large firm may deal
with line managers on an equal footing and be involved in framing
and carrying out policy matters of significance.  It is important
to distinguish between these two examples for purposes of
determining exemptions.

Will of Corporate Bonds, Esq
January 7, 1993
Page 9

Professional Employees

The IWC has adopted nine specific professions, licensed or
certified in California, which are exempt.  The DLSE policy had
historically been that only the professional listed in those nine
licensed or certified professions could be considered for that
exemption. For instance, only doctors, not nurses or other health
care workers could be included; and only lawyers, not court re-
porters or other legal support personnel could be included in the
exemption.

However, the IWC has now adopted the "learned or artistic"
category in Orders 4, 5, 9 and 10.  The IWC in its "Statement of
Basis" in those Orders indicated that the DLSE would be permitted
to use, but not be limited to the use, of the Federal Regulations
for purposes of interpretation. The DLSE has decided to use these
guidelines which are applicable and consistent with the IWC Orders.
(See Interpretive Bulletin 89-2). The guidelines which may be used
are contained at 29 C.F.R. §541.302 through §541.308. Where the
regulations are inconsistent with the IWC Orders, however, they
cannot be utilized. (For example, §541.304 dealing with the term
"primary duty" which, as discussed above, is inconsistent with the
term "engaged in" used in the IWC Orders, and §541.309, et seq.
which deal with non-exempt work and salary tests[10])

The "learned or artistic" category is designed to broaden the
"professional" exemptions available under the IWC Orders.  The in-
tent was to exclude those employees in work classifications not in
need of the protections offered by the Orders, without requiring a
listing of each such classification.

Use of the Federal Regulations

As detailed above, the federal regulations may only be relied
upon when either the IWC has approved such use, and/or the DLSE
policy has approved such use.[11]  The federal regulations, in many

---

[10]   One of the most striking examples of the difference between the IWC Orders
and the enforcement of the federal Fair Labor Standards Act is the fact
that there is no "remuneration" or salary test for the professional
employee exemption under the IWC Orders while under the regulations
adopted by the Department of Labor to enforce the FLSA there is a salary
test for professional status which is actually higher than the salary test
for executive and administrative.

[11]   As noted above, the IWC in its Statement of Basis has specifically
authorized (but not required) the DLSE to adopt the "federal guidelines"
(regulations) for purposes of enforcement of the newly adopted "learned

William Cochran-Bond, Esq.
January 7, 1993
Page 10

instances, actually involve new laws which the FLSA authorizes the Secretary of Labor to enact.  Examples are the definitions of executive, administrative and professional which add salary tests not contained in the FLSA.  Obviously, the State of California does not contemplate deferring its law-making authority to the U.S. Secretary of Labor; however, if the federal regulations were required to be followed, that would be the result.[12]  A recent development is the amendment of the Fair Labor Standards Act which provides that the Secretary of Labor is directed to adopt regulations which would exempt computer programmers from the overtime requirements of the Act if the regular hourly wage paid to the computer programmers is at least six and one-half times the federal minimum wage.  This provision obviously has no effect in California inasmuch as the law does not permit the DLSE to adopt any such "salary test".

---

and artistic" category.  In addition, the DLSE has adopted the language used in some of the Regulations adopted by the DOL where, and to the extent, that such language is appropriate.  However, as explained above, while some of the criteria contained in the Regulation may be helpful, other portions of the Regulation would not be appropriate because it is based upon provisions in the FLSA which are not contained in the IWC Orders.

[12]    There is one instance where Division policy has historically recognized that a portion of the IWC Order was closely patterned on a federal regulation and the DLSE adopted an enforcement policy which reflected that fact.  Section 3(G) of Order 9 provides:

> "The daily overtime provision of subsection (A) above shall not apply to ambulance drivers and attendants scheduled for twenty-four (24) hour shifts of duty who have agreed in writing to exclude from daily time worked not more than three (3) meal periods of not more than one hour each and a regularly scheduled uninterrupted sleeping period of not more than eight (8) hours. The employer shall provide adequate dormitory and kitchen facilities for employees on such a schedule."

In the case of Monzon v. Schaeffer Ambulance Service, Inc. (1990) 224 Cal.App.3d 16, the Second District Court of Appeal in what must be described as an unusual reading of the law, agreed with the DLSE that the law was "patterned" on the federal law, but disagreed with the Division's position that the clear language of the order required that the agreement to exclude the sleep time must, under the California law, be in writing. As the dissent points out, the court's decision "overlooks the well-settled, common-sense principle that federal interpretations of the federal labor laws are not controlling in any sense where, as here, the language and intent of the IWC Orders differ in language and intent from the federal statutes and regulations." (Citing to Skyline Homes, Inc. v. Department of Industrial Relations (1985) 165 Cal.App.3d 239.

William Cochran-Bead, Esq.
January 7, 1993
Page 11


Again, the Division emphasizes that the California employer
must comply with the more stringent law, federal or state, in this
area.  As you can see, there are times when the federal law may
impose a greater burden on the employer than does the California
law.   In those instances, compliance with the federal law and
regulations is required.

We hope that this explanation is of assistance to you and your
client. If you have any further questions, please contact the near-
est District office of the Division of Labor Standards Enforcement
District office.


Yours truly,



H. THOMAS CADELL, JR.
Chief Counsel
c.c. Victoria Bradshaw, State Labor Commissioner
     Simon Reyes, Assistant Labor Commissioner
     Nance Steffen, Regional Mgr., Hdqtrs.

STATE OF CALIFORNIA                                    PETE WILSON,   Governor

DEPARTMENT OF INDUSTRIAL RELATIONS
**DIVISION OF LABOR STANDARDS ENFORCEMENT**
*LEGAL SECTION*
45 Fremont Street, Suite 3220
San Francisco, CA 94105
(415) 975-2060

MILES E. LOCKER, *Chief Counsel*


October 5, 1998


Marcie E. Berman, Esq.                        SENT BY MAIL AND FAXED
Rudy, Exelrod, Zieff & True                     TO (415) 434-0513
351 California Street, Suite 700
San Francisco, CA  94104


          Re:  Applicability of the Administrative Exemption
               to Insurance Company Claims Representatives


Dear Ms. Berman:

          This is in response to your letter of September 14, 1998,
requesting an opinion as to whether insurance company claims
representatives are covered by the overtime provisions of
Industrial Welfare Commission Wage Order 4-98 [Cal. Code of
Regulations § 11040, hereinafter referred to as IWC Order 4][1] or
whether said employees are exempt as "persons employed in
administrative capacities" as described in Section 1 of the Wage
Order.[2]

_____

          [1]  Sections 3 ("Hours and Days of Work") and 11("Meal Periods") of Wage
Order 4 were amended, effective January 1, 1998; other amendments mandated by
increases in State and Federal minimum wage statutes were also incorporated into
the reprinted Wage Order, which amended Wage Order 4-89.  There were no changes
to Sections 1 and 2, which include the language relevant to your inquiries on
exemptions.

          [2]  The inclusion of  the administrative exemption in IWC Wage Orders dates
back to 1947.  The minutes of an IWC meeting on March 7, 1947 state at p. 3 that
the Commission received and acknowledged evidence and argument that failure to
exempt "executive, administrative and professional women" ( IWC Wage Orders only
applied to women and minors at that time) imposed a  roadblock to advancement for
employees in such positions.  The minutes further state at p. 4  the intent of
the Commission to include such exemptions in its Wage Orders  using the federal
criteria as a guide.  See "Executive, Administrative, Professional...Outside
Salesman Redefined" *Report and Recommendations of the Presiding Officer at
Hearings Preliminary to Redefinition*, United States Department of Labor,
October 24, 1940, for the federal criteria in existence at the time of the
inclusion of said exemptions by the IWC.  The Wage Orders were later amended to
apply to employees of both genders, see *Industrial Welfare Commission v. Superior
Court* (1980) 27 Cal. 3d 690,  700-701.

**1998.10.05**

Marcie E. Berman
October 5, 1998
Page 2


Both the Fair Labor Standards Act and the Wage Orders
promulgated by the Industrial Welfare Commission are remedial in
nature. Accordingly, "[t]he employer bears the burden of proving
an employee is exempt. (*Corning Glass Works v. Brennan* (1974) 417
U.S. 188, 196-197)  Exemptions are narrowly construed against the
employer and their application is limited to those employees
plainly and unmistakably within their terms. (*Dalheim v. KDFW-TV*
(5th Cir. 1990) 918 F.2d 1220, 1224.)"  *Nordquist v. McGraw-Hill
Broadcasting Co.* (1995) 32 Cal.App.4th 555, 562.

As I am sure you are aware, neither federal nor state
agencies, when interpreting regulations relating to exempt status,
nor courts hearing such matters, place any reliance on the job
title, but focus on the actual job duties performed. "Titles alone
are of little or no assistance in determining an employee's exempt
or nonexempt status." *Freeman v. NBC* (S.D.N.Y. 1993) 846 F. Supp.
1109, 1115, *rev'd on other grounds,* 80 F.3d 78 (2nd Cir. 1996).
"Titles can be had cheaply and are of no determinative value." 29
C.F.R. §541.201(b).

Thus, a determination as to whether an employee or group of
employees are exempt or non-exempt from overtime provisions
requires a thorough investigation as to the actual work performed
by the employee(s).  This is a fact intensive inquiry, and for this
reason, the Division generally cannot issue a ruling as to the
exempt or non-exempt status of any specific employee(s) without
either conducting our own investigation or by ascertaining the
relevant facts in an adjudicatory capacity through an evidentiary
hearing.  However, there are occasions when material facts are not
in dispute, or when we are requested to set forth the Division's
opinion in response to a statement of facts provided by the
requesting party.  Such opinion letters are authorized by statute
as a means of providing guidance to the public, and may be
considered by a court confronting a similar issue.  (Labor Code
section 1198.4; *Tidewater Marine Western, Inc. v. Bradshaw* (1996)
14 Cal.4th 557, 571 ["agencies may provide parties with advice
letters, which are not subject to the rulemaking provisions of the
APA."]; *Yamaha Corp. v. State Board of Equalization* (1998) 19
Cal.4th 1 [discussing the degree of deference to be accorded by

1998.10.05

Marcie E. Berman
October 5, 1998
Page 3

courts to agency opinion letters interpreting statutes or regulations].)

In your letter, you set forth the job duties of insurance company claims representatives as follows:

"This claims representative handles claims under personal (as opposed to commercial) auto insurance policies. In accordance with company guidelines setting forth estimating policies and procedures, he estimates the extent of auto damage and repair cost, in addition to allowable medical and related costs attendant to bodily injury claims sometimes filed in connection with a car accident. In the course of this claims processing, he passes along to the insurance company any information which may suggest potential fraud or which may provide the insurance company the opportunity to obtain reimbursement from another party to the accident ('subrogation'). Before closing a claims file, he must get higher approvals if the amount of the estimate exceeds the dollar authority level granted to him by the insurance company."

You ask two questions. First, you ask whether, in determining whether certain employees function in an "administrative" capacity, the DLSE would apply the same analysis as that applied under federal regulations; that is, would our analysis focus on whether the employees' job activities are *directly related to management policies or general business operations* or are *"production"* in nature. Second, you ask if the facts set forth in your letter would lead DLSE to conclude that the employees described therein are nonexempt because their duties demonstrate that they are engaged in *"production"* activities.

To answer your first question, California law is not identical to federal law on the issue of exempt status. The Fair Labor Standards Act provides, at 29 U.S.C. §213(a)(1), that the minimum wage and overtime provisions of the Act [29 U.S.C. §§ 206 and 207, respectively] do not apply to:

"Any employee employed in a bona fide executive, administrative, or professional capacity (including any

1998.10.05

Marcie E. Berman
October 5, 1998
Page 4

employee employed in the capacity of academic
administrative personnel or teacher in elementary or
secondary schools), or in the capacity of outside
salesman (as such terms are defined and delimited from
time to time by regulations of the Secretary [of Labor],
subject to the provisions of subchapter II of chapter 5
of Title 5, except that an employee of a retail or
service establishment shall not be excluded from the
definition of employee employed in a bona fide executive
or administrative capacity because of the number of hours
in his workweek which he devotes to activities not
directly or closely related to the performance of
executive or administrative activities, if less than 40
per centum of his hours worked in the workweek are
devoted to such activities)...."

Wage Order 4 [Section 1(A)] provides the following exemption
for administrative, executive or professional employees:

"Provisions of Sections 3 through 12 shall not apply to
persons employed in administrative, executive or
professional capacities. No person shall be considered
to be employed in an administrative, executive, or
professional capacity unless ....

(1) The employee is **engaged in work** which is **primarily**
intellectual, managerial, or creative, and which requires
the exercise of discretion and independent judgment, and
for which the remuneration is not less than $1,150 per
month. . . ."[3] (emphasis added.)

As you can see, the language of the Fair Labor Standards Act
differs somewhat from that of the IWC Wage Order. The FLSA simply
requires that the employee be employed in an administrative
capacity, while Wage Order 4 requires that the person be **engaged in**

---

[3] The following subparagraph exempts employees engaged in various
enumerated licensed professions, and employees engaged in occupations that are
"commonly recognized as a learned or artistic profession." These exemptions are
clearly inapplicable to insurance claims representatives.

1998.10.05

Marcie E. Berman
October 5, 1998
Page 5

**work** which is **primarily**[4] intellectual, managerial, or creative, and which requires exercise of discretion and independent judgment.

The federal scheme allows the Secretary of Labor, through appropriate regulations, to define the terms used to describe exempt employees. The Department of Labor, which is headed by the Secretary of Labor, has promulgated such regulations at 29 C.F.R. §541 et seq. These regulations outline both the "long" and "short" tests of bona fide administrative employee status. Section 541.2(a) through (e) ( the "long test") defines the term "employee employed in a bona fide administrative capacity" as being an employee:

(a)[w]hose primary duty consists of....

(1)the performance of ... office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers,....and

(b)[w]ho customarily and regularly exercises discretion and independent judgment; and

(c)...(3)[w]ho executes under only general supervision special assignments and tasks; and

(d)[w]ho does not devote more than 20 percent, or in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (c) of this section...; and

(e)(1)[w]ho is compensated for his services on a salary or fee basis at a rate of not less than $155 per week."

---

[4] Section 2 of Wage Order 4 defines "primarily" to mean "more than one half of the employee's work time." In 1993, Wage Orders 4 and 5 were amended to provide a relaxed definition of "primarily" that is expressly limited to employees in the "health care industry."

1998.10.05

Marcie E. Berman
October 5, 1998
Page 6


Section 541.214 (the "short test") provides:

> "(a) Except as otherwise noted in paragraph (b) of this section, §541.2 contains a special proviso including within the definition of "administrative" an employee who is compensated on a salary or fee basis at a rate of not less than $250 per week exclusive of board, lodging, or other facilities, and whose primary duty consists of either the performance of office or non manual work directly related to management policies or general business operations of the employer or the employer's customers,...where the performance of such primary duty includes work requiring the exercise of discretion and independent judgment. Such a highly paid employee having such work as his or her primary duty is deemed to meet all the requirements in §541.2 (a) through (e).

Thus the "short test" exempts employees who meet that test's higher salary threshold **AND** whose "primary duty" is "directly related to management policies or general business operations of the employer" (or the employer's customers) **AND** where such work requires the exercise of discretion and independent judgment.

The key difference between either federal test and the IWC Wage Order is the distinction between the federal focus on "primary duty" and the state focus on whether the employee is actually engaged in exempt work for more than half of the hours worked in the workweek. Unlike the strictly time-based definition of "primarily" contained in each of the IWC orders[5], the federal regulations expressly provide that "time alone . . . is not the sole test", allowing for a finding of exempt status even "in situations where the employee does not spend over 50% of his time in [exempt] duties." 29 C.F.R. §§541.103, 541.206(b). In addition to this difference between the federal "primary duty" test and the state "primarily engaged in" test, the IWC orders (unlike the federal "long" and "short" tests) do not provide for a lower level

---

[5] With the exception, as discussed above, of employees in the "health care industry" covered by IWC Orders 4 or 5.

Marcie E. Berman
October 5, 1998
Page 7

of scrutiny for higher compensated employees.[6]  These differences between state and federal law notwithsatnding, the Division of Labor Standards Enforcement has traditionally followed federal cases and federal regulations, to the extent that such cases and regulations are not inconsistent with state wage and hour provisions, in interpreting and enforcing the various IWC wage orders, including Wage Order 4.  Thus, in an opinion letter dated January 7, 1993, DLSE Chief Counsel H. Thomas Cadell explained:

"Again, in determining the exemption status under the administrative category, the key phrase is 'engaged in' and not, as under the federal regulations, 'primary duty' (29 C.F.R. §541.2(a)) With this exception, the DLSE accepts the general definition of 'administrative duties' set out by the DOL at 29 C.F.R. §541.2. Generally, administrative work must be nonmamual, related to management policies or general business operations of the employer or the employer's customers and must involve the customary and regular exercise of discretion and independent judgment.  The Department of Labor's regulations discuss the administrative exemption in detail at 29 C.F.R. §541.201 through §541.208 and the DLSE adopts these definitions.  However, it must be noted that certain of the regulations not contained within the above cited sections inconsistent with the IWC Orders and cannot be relied upon."[7]

29 C.F.R. §541.205 is thus one of the federal regulations that DLSE follows in enforcing the provisions of IWC Order 4.  Section 541.205(a) defines the phrase "directly related to management policies or general business operations of [the employee's]

---

[6]  In contrast to the federal regulations, the IWC Orders do not set out different exemption tests for lower salaried and higher salaried employees. Order 4, for example, contains a threshold requirement of $1,150 per month; that is, if the employee's salary falls below that amount, the employee, even if "primarily engaged in" administrative or executive duties, is non-exempt. As to employees whose salary is not less than this amount, no matter how highly compensated the employee may be, one set of criteria are appplied in determining whether the employee is exempt or non-exempt.

[7]  For example, DLSE will not rely on federal regulations under which nurses may be considered exempt because the IWC has expressly provided that nurses are not exempt from coverage of Order 4.  Likewise, the IWC has defined "teaching" in a manner that does not exempt certain teachers, thereby precluding reliance on federal regulations dealing with the exemption for teachers.

Marcie E. Berman
October 5, 1998
Page 8

employer or [the] employer's customers" as "those types of
activities relating to the administrative operations of a business
as distinguished from 'production' or, in a retail or service
establishment, 'sales' work."  Furthermore, Section 541.205(a)
"limits the exemption to persons who perform work of substantial
importance to the management or operation of the business of [the]
employer or [the] employer's customers."  Thus, in answer to your
first question, DLSE uses the test set out at 29 C.F.R. §541.205 in
determining the applicability of the administrative exemption under
IWC Order 4.  In other words, if an employee is primarily engaged
in "production" or "sales" work, rather than in activities
"directly related to management policies or general business
operations," the employee does not fall within the administrative
exemption from IWC Order 4's overtime requirements.

    In response to your second question, it appears, based upon
the description of duties set forth in your letter, that the
insurance claims representatives described therein are not
primarily engaged in activities "directly related to management
policies or general business operations," and thus, are not exempt
from overtime under Order 4.  In reaching this conclusion, we rely
upon federal regulations, subject to the limitations discussed
above, and federal case law.[8]

    Numerous courts have held that the "concept of 'production' in
29 C.F.R. §541.205(a)'s administrative/productive work dichotomy is
not to be understood as covering only work involving the
manufacture of tangibles. The concept is not limited to
manufacturing activities. . . . [N]on-manufacturing employees may
therefore be 'production' workers for purposes of the dichotomy."
*Martin v. Cooper Electric Supply Co.* (3rd Cir. 1991) 940 F.2d 896,
903, *cert den.* 503 U.S. 936, 112 S.Ct. 1473 (1992).  See also,
*Reich v. State of New York* (3rd Cir. 1993) 3 F.3d 581 [holding that
production/administrative dichotomy applies outside the
manufacturing context, and that investigators employed by the State

_____

    [8] "Federal interpretations of federal labor laws may provide persuasive
authority for interpreting state law; with the persuasiveness of federal
authority being less when the state law differs from the federal." *Aguilar v.
Association for Retarded Children* (1991) 234 Cal.App.3d 21, 31.  "Because the
California wage and hour laws are modeled to some extent on federal laws, federal
cases may provide persuasive guidance." *Nordquist v. Mc-Graw Hill Broadcasting
Co.*, *supra*, 32 Cal.App.4th at 562.

1998.10.05

Marcie E. Berman
October 5, 1998
Page 9

Police Bureau of Criminal Investigation, and who are responsible
for conducting investigations, are engaged in non-exempt
"production" work. because investigations are part of a law
enforcement agency's "product"].

"The distinction §541.205(a) draws is between those employees
whose primary duty is administering the business affairs of the
enterprise from those whose primary duty is producing the commodity
or commodities, whether goods or services, that the enterprise
exists to produce and market." *Dalheim v. KDFW-TV* (5th Cir. 1990)
918 F. 2d 1220, 1230 (emphasis added). In applying §541.205, the
Fifth Circuit held that news producers, directors and assignment
editors were not exempt administrators because their work related
to the "production" of the product being marketed by the employer,
namely, the newscast, and had little or nothing to do with "setting
business policy, planning the long- or short-term objectives of the
news department, promoting the newscast, negotiating salary or
benefits with other department personnel, or any of the other types
of 'administrative' tasks noted in §541.205(b)."[9]  *Id.* at 1231.
Thus rejecting the employer's argument that the term "production,"
as used in section 541.205(a) applied only to "blue collar
manufacturing employees," the *Dalheim* court concluded that where
the "product" which the enterprise exists to produce and market is
a service, the employees whose work consists of providing that
service are engaged in "production" and are not exempt
administrative employees.

This analysis has become the touchstone of judicial
determinations of exempt administrative status. Administrative
activity, as defined at C.F.R. §541.205(b), "denotes employment
activity ancillary to an employer's principal production activity,
whether that be production of a 'commodity or commodities, . . .
goods or services', see *Dalheim, 918 F.2d at 1230,* or [in the case
of a wholesale distributor] production of wholesale sales." *Martin
v. Cooper, supra,* 940 F.2d 896, 904-905 [holding that inside
salespersons employed by a wholesale distributor are engaged in

---

[9] 29 C.F.R. §541.205(b) provides, in relevant part, that "[t]he
administrative operations of the business include the work performed by so-called
white collar employees engaged in 'servicing' a business as, for example,
advising the management, planning, negotiating, representing the company,
purchasing, promoting sales, and business research and control."

Marcie E. Berman
October 5, 1998
Page 10

"production" within the meaning of section 541.205(a), that
negotiating with customers in the course of making wholesale sales
does not constitute administrative "servicing" of the business
within the meaning of 29 C.F.R. §541.205(b), and thus, that such
employees are non-exempt].

The Ninth Circuit applied this same analysis, in *Bratt v.
County of Los Angeles* (9th Cir, 1990) 912 F. 2d 1066, *cert. den.*
498 U.S. 1086 (1991), in holding that county probation officers,
who conducted investigations of adult offenders and/or juvenile
detainees, and who advised the court as to appropriate sentencing
or other case disposition, did not meet the test of performing work
directly related to management policies or general business
operations. The Court held that the essence of the distinction
between activities "directly related to management policies" and
those related to "production" was that between "the running of a
business, and not merely . . . the day-to-day carrying out its
affairs." *Id.* at 1070. The work of the probation officers at issue
was held to involve the day-to-day carrying out of the business of
the probation department, as opposed to the overall operational
management or policies of that agency. The court further held that
recommendations made by the probation officers as to appropriate
sentencing did not relate to the operation of the courts or court
policy, but merely served to provide information to be used by the
courts in the exercise of the court's discretionary functions.

District courts applying this analysis have concluded that
employees responsible for estimating or investigating insurance
claims, when employed by businesses engaged in the estimation or
investigation of such claims, are non-exempt "production"
employees. In *Reich v. American International Adjustment Company*
(D. Conn. 1994) 902 F.Supp. 321, 325, the court held that
automobile damage appraisers employed by a business engaged in the
appraisal of damage claims, who inspect vehicles, determine the
extent of necessary repairs, estimate repair costs, and, when
necessary, negotiate with body shops regarding repair costs
"perform the day-to-day activities of the business . . . [and,
therefore] do not administer the business of [the employer]."
Similarly, in *Gusdonovich v. Business Information Company* (W.D.
Penn. 1985) 705 F.Supp. 262, the court held that an investigator,
employed by a company that investigates and collects information
for insurance companies, and whose primary duty consisted of

1998.10.05

Marcie E. Berman
October 5, 1998
Page 11

investigating insurance claims, was non-exempt because the
employer's "business is 'producing' information for its clients,
and the plaintiff's duties consisted almost entirely of gathering
that 'product'. Thus . . . plaintiff was engaged in 'production'
within the meaning of the regulation." *Id.* at 265.

Of course, this analysis requires us to look not only at the
nature of the employee's work, but also at the nature of the
employer's business. Investigators employed by a law enforcement
agency are considered to be engaged in non-exempt "production" work
(*Reich v. State of New York*, *supra*), while postal inspectors
employed by the U.S. Postal Service have been held to be exempt
"administrators" (*Sprague v. United States* (Ct. Cl. 1982) 677 F.2d
865). These seemingly conflicting results are easily explained.
"[T]he business of the Post Office is delivering the mail. An
employee who works for the Post Office in an investigatory role
would not appear to be performing a line function in that
organization." *Adam v. United States* (1992) 26 Cl. Ct. 782, 791
[holding that U.S. Border Patrol agents, whose duties include
conducting investigations and preparing cases for prosecution, are
non-exempt because these agents carry out the "end function of the
Border Patrol"].

Thus, in *Haywood v. North American Van Lines, Inc.* (7th Cir.
1997) 121 F.3d 1066, the court held that an employee employed by an
employer in the business of shipping household goods for consumers
relocating within the United Sates or Canada, and whose job duties
consist of negotiating and resolving billing disputes and customer
claims regarding damages or delays concerning shipped goods, is not
engaged in "production" activities within the meaning of 29 C.F.R.
§541.205(a), but rather, is engaged in administrative activities by
"servicing" the business within the meaning of section 541.205(b).
The court explained that the defendant's "product" consists of
moving household goods, and that plaintiff's duties are "ancillary
to the production process of actually moving the household goods."
*Id.* at 1071-1072. The court compared plaintiff's job functions to
those of "claims agents" and "adjustors," job categories that are
expressly mentioned in the federal regulations.

To be sure, 29 C.F.R. §541.205(c)(5) states that "many
persons" employed as "advisory specialists and consultants of
various kinds," including "claims agents and adjustors," meet

1998.10.05

Marcie E. Berman
October 5, 1998
Page 12

"[t]he test of directly related to management policies or general
business operations."[10]    In seeming contrast, 29 C.F.R.
§541.205(c)(2) provides:

> "An employee performing routine clerical duties obviously
> is not performing work of substantial importance to the
> management or operation of the business even though he
> may exercise some measure of discretion and judgment as
> to the manner in which he performs his clerical tasks....
> An inspector, such as, for example, **an inspector for an
> insurance company**, may cause loss to his employer by the
> failure to perform his job properly. but such employees,
> obviously, are not performing work of such substantial
> importance to the management or operation of the business
> that it can be said to be "directly related to management
> policies or general business operations" as that phrase
> is used in §541.2." (emphasis added.)

Taking into account, again, that it is the duties (or in state
law, the work performed), rather than the titles, that determine
exempt status, it would appear that the apparent conflict between
subsections (c)(2) and (c)(5) of section 541.205 turns on the
production/administration dichotomy. The types of employees listed
at §541.205(c)(5) function as advisors either to the employer or
the employer's customers, and the advice rendered concerns either
the inner workings of the employer's business or the business
affairs of the customer. A claims adjustor employed by an employer
whose principal business is not that of handling claims is not
engaged in production work, and falls under the ambit of section
541.205(c)(5).    In contrast, the processing and resolution of
claims constitutes the principal product of an insurance company,
so that an insurance company claims adjustor is nothing more than
a line worker, engaged in the "production" of his or her employer's

---

[10]    This reference to "claims agents and adjustors" is derived from the
1940 DOL Report which defined the "administrative" exemption . See *fn. 2, supra*.
The Report did not expressly refer to **insurance company** claims agents or
**insurance company** adjustors.  The Report did give an example of a "claim agent
for a large oil company," with authority to settle large claims, as an employee
who would come within the administrative exemption.  Obviously, such an employee
is not engaged in the day-to-day "production" work of his or her employer.
("*Executive, Administrative, Professional . . . Outside Salesman" Redefined,
Report and Recommendations*, October 24, 1940, at pp. 24-25.)

Marcie E. Berman
October 5, 1998
Page 13

principal product.  An adjustor employed by an insurance company (as opposed to a claims adjustor employed by, for example, an oil company) cannot be said to be performing work that is "directly related to management policies or general business operations" or that is "of substantial importance to the management or operation of the business."  For this reason, section 541.205(c)(2) tells us that an insurance company "inspector" is not engaged in exempt "administrative" work.

In the instant query, the product being marketed is the service which is attendant to the purchase of the policy of insurance.  In other words, when the consumer is involved in an accident, the "service" rendered by the insurer is assessment of the damages and estimation of the cost of making the insured whole for the loss incurred, including diminution of that cost by passing on information obtained regarding the possible liability of third parties. In processing insurance claims, the insurance company claims representative is therefore engaged in producing the precise product or service that is sold by his or her employer to its customers.  Such activities are not administrative in nature, within the meaning of the IWC Wage Order.

Your query further states that the claims representative also "passes along to the insurance company any information which may suggest possible fraud."  In this regard, the insurance company claims representative functions in the same manner as the probation officers in *Bratt*.  The transmittal of information as to which others will exercise discretion and independent judgment as to the course of action to be followed indicates the absence of discretion essential to the administrative exemption.  Your stated facts also aver that to the extent an estimate exceeds the monetary limits set by the insurance company, the claims representative must seek approval from someone who has the authority to override such limits.  This procedure suggests that the claims representative plays no role in setting such limits, and thus, does not perform exempt administrative "work of substantial importance to the management or operation of the business."  We therefore conclude that the insurance company claims representatives described in your letter are not primarily engaged in work that is "directly related to management policies or general business operations of [their] employer or [their] employer's customers."

1998.10.05

Marcie E. Berman
October 5, 1998
Page 14

Under IWC Order 4, the administrative exemption will not apply unless the employee receives the minimum required remuneration **and** "is engaged in work which is primarily intellectual[11], managerial, or creative **and** which requires exercise of discretion and independent judgement[12]." (emphasis added.) These requirements are expressed in the conjunctive; the absence of any one defeats the exemption.

The requirements for establishing the administrative exemption under the federal regulations are also expressed in the conjunctive. All five of the criteria set forth §541.2 must be met before an employee will be considered exempt under the federal "long test" and deprived of the protection of the FLSA. *Mitchell v. Williams* (8th Cir. 1969) 420 F.2d 67, 69. Most cases interpreting the regulations have focused on the first two requirements, found at section 541.2(a) and (b), which essentially correspond to the criteria under the "short test" discussed at 29 C.F.R. §541.214. The separate components of the "short test" have been held to be "analytically distinct," and thus, a determination that employees primarily function in a "production" capacity makes it unnecessary to also determine whether those employees exercise discretion and independent judgment. In other words, once it is determined that the employee's primary duty does not consist of "work directly related to management policies or general business operations of [the] employer or [the] employer's customers," further inquiry is unnecessary, and the employees will be found to be non-exempt. *Martin v. Cooper Electric Supply Co.*, supra, 940 F.2d at 907, fn. 10; *Bratt v. County of Los Angeles*, supra, 912 F.2d at 1071.

Consequently, we would conclude that the insurance company claims representatives described in your letter are not exempt without considering whether their work requires the exercise of

---

[11] The Wage Order does not define the term "intellectual" work. However, in view of the IWC's expressed intent to use the federal exemption criteria as guidance (see *fn. 2, supra*), this term can only be understood to embrace the requirements of 29 C.F.R. §541.2(a)(1), that is, within the meaning of the IWC Order, "intellectual work" is "office or nonmanual work directly related management policies or general business operations of [the] employer or [the] employer's customers."

[12] This requirement closely mirrors the language of 29 C.F.R. §541.2(b).

Marcie E. Berman
October 5, 1998
Page 15

discretion and independent judgment. However, we will take this
opportunity to state that the Division, in determining whether an
employee is primarily engaged in work that "requires exercise of
discretion and independent judgment," within the meaning of the
various IWC wage orders, would rely on the federal guidelines set
out at 29 C.F.R. §541.207. Under that regulation, the employee, to
be exempt, must have the authority or power to make independent
choices "free from immediate direction and supervision, and with
respect to matters of significance." (§541.207(a).) Moreover, "the
discretion and independent judgment exercised must be real and
substantial, that is, they must be exercised with respect to
matters of consequence." (§541.207(d)(1).) Also, to be exempt,
the employee must exercise discretion and independent judgment
"customarily and regularly." (§541.207(g).) Finally, the
regulations warn:

> "Perhaps the most frequent cause of misapplication of the
> term "discretion and independent judgment" is the failure
> to distinguish it from the use of skill in various
> respects. An employee who merely applies his knowledge
> in following prescribed procedures or determining which
> procedure to follow, or who determines whether specified
> standards are met or whether an object falls into one or
> another of a number of definite grades, classes or other
> categories, with or without the use of testing or
> measuring devices, is not exercising discretion and
> independent judgment within the meaning of §541.2. This
> is true even if there is some leeway in reaching a
> conclusion, as when an acceptable standard includes a
> range or a tolerance above or below a specific standard."

29 C.F.R. §541.207(c)(2).

Applying these criteria to the facts stated in your letter, we
cannot conclude that the claims representatives customarily and
regularly exercise discretion and independent judgment as to
matters of significance. Indeed, insofar as claims must be handled
"in accordance with company guidelines setting forth estimating
policies and procedures", it would appear that the functions of the
claims representative are best described by section 541.207(c)(2).
Furthermore, the requirement that claims representatives obtain the
approval from higher level employees when the amount of the

1998.10.05

Marcie E. Berman
October 5, 1998
Page 16


estimate exceeds the "dollar authority level granted . . . by the
insurance company," suggests that whatever discretion and
independent judgment is exercised is confined to matters that are
not substantial, and that the claims representatives do not have
the authority to make independent choices, free from immediate
direction and supervision, with respect to matters of consequence.

        Thank you for your interest in California labor law.  I trust
the above addresses the matters raised by your inquiry.  If you
have any additional questions, please feel free to contact the
undersigned.


                            Sincerely,

                            Miles E. Locker
                            Chief Counsel


cc:  Jose Millan
     Tom Grogan
     Greg Rupp
     Nance Steffen


                                                    1998.10.05